## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 24 2016, 8:24 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANTS

Kimberly A. Jackson
Indianapolis, Indiana

Steven J. Halbert
Carmel, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General

David E. Corey
Deputy Attorney general
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| T.T.-R. and D.S., <br> *Appellants-Defendants,* <br><br> v. <br><br> Indiana Department of Child Services, <br> *Appellee-Plaintiff.* | March 24, 2016 <br><br> Court of Appeals Case No. 49A05-1508-JT-1079 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Larry Bradley, Magistrate <br><br> The Honorable Marilyn Moores, Judge <br><br> Trial Court Cause No. 49D09-1409-JT-400 |

**Altice, Judge.**

## Case Summary

[1] T.T.-R (Mother) and D.S. (Father) (referred to collectively at times as Parents) appeal the involuntary termination of their parental rights to C.S. (Child). They individually challenge the sufficiency of the evidence supporting the termination.

[2] We affirm.

## Facts[1] & Procedural History

[3] Parents have a daughter together, Child, born on August 23, 2009. Parents both have substantial histories with the Department of Child Services (DCS). After a lengthy CHINS proceeding, Father consented to the termination of his parental rights to his four-year-old son in 2009. Thereafter, in another CHINS case involving a daughter (not Child), Father consented to the termination of his parental rights in 2010. Although Mother has not had her rights in other children terminated, she has two other children with whom she has not had primary custody. Mother has an adult son who primarily resided with his father, Mother's first husband, during the son's adolescence. She also has a daughter, A.T., with her second husband. A.T. lives with her father and has been the subject of DCS investigations a number of times, with substantiated neglect findings in 2003, 2007, 2008, and 2012. In July 2012, A.T. became the subject of a CHINS proceeding

---

[1] In his reply brief, Father requests that we strike the statement of facts section of DCS's brief. This request is summarily denied.

and was removed from her father's home. Mother received services through DCS regarding A.T.'s CHINS case, which was near the end of 2014.

[4] In the meantime, DCS was alerted to concerns regarding Child's living conditions. On March 17, 2013, investigators discovered deplorable conditions at Mother and Father's residence, which was a converted garage with no heat or running water and little food. The toilet and buckets were filled with urine and feces. The kitchen was covered in dirt and rodent feces. Child, three and a half at the time, was filthy and smelled of urine. Her head was infested with lice, and she exhibited significant speech delays. Child was immediately removed from the home and taken to a foster home, where she has remained throughout this case.

[5] DCS filed a CHINS petition regarding Child on March 19, 2013, based on her parents' failure to provide a safe, sanitary, and appropriate living environment. Child was adjudicated a CHINS on April 23, 2013. At the subsequent dispositional hearing, Mother and Father were ordered to secure and maintain adequate sources of income and suitable, safe, clean, and stable housing with sufficient bedding, utilities, and food. They were also ordered to engage in home-based counseling, complete psychological evaluations, and successfully complete any resulting recommendations. Additionally, Father was ordered to complete a Father Engagement Program. Although Mother had recently completed a parenting assessment and classes in A.T.'s CHINS case, service providers continued working on her parenting skills.

[6] The record establishes that Mother and Father both have significant cognitive impairments, which affect their ability to parent and benefit from the services provided by DCS. Specifically, Mother's psychological evaluation identified her as being in the lower extreme range of intellectual functioning. Mother also suffers from anxiety disorder and personality disorders with dependent, narcissistic, and schizoid trends. Father self-reported that he had been diagnosed as having mild retardation, as well as bipolar disorder and post-traumatic stress disorder (PTSD). His mental health evaluation during the CHINS case confirmed the PTSD and bipolar diagnoses. While his mental health therapist did not indicate a diagnosis of mental retardation, she indicated that Father had a cognitive impairment that resulted in lack of insight.

[7] Between March 2013 and September 2014, Mother and Father engaged regularly in services provided by DCS. This included, among other things, mental health therapy, home-based counseling and case management, and supervised visitation. Although Mother and Father consistently participated in services, providers generally agreed that Mother and Father were not adequately progressing despite lengthy provision of services. They continued to lack insight regarding parenting Child in a safe and appropriate way. In fact, Father adamantly refused to work on parenting with his life skills instructor and did not appear to believe that having utilities and a stable home for Child were a necessity.[2] During visits, Father often

---

[2] Father felt DCS was imposing its values on him. He agreed to work on his anger issues but "refused to work on parenting and stat[ed] that it had no bearing on the case and he already knew how to parent." *Transcript* at 421.

engaged in inappropriate conversations around or with Child. At no time did service providers recommend unsupervised visitation.

[8] Around September 2013, Parents moved into their current two-bedroom apartment, which they share with their roommate Mindy. The physical location of their housing remained stable thereafter. The conditions of the home, however, did not. In the approximately 800-square-foot apartment, they regularly had a number of additional individuals living with them, as well as up to ten pets (including cats, dogs, gerbils, and rabbits) that they did not properly care for. It was not uncommon for the house guests to be sleeping on wooden pallets in the living room during Child's supervised visitation. The apartment often smelled of smoke, animals, and unwashed bodies. Service providers consistently raised concerns to Mother and Father regarding the animals and extra people in the home. Mother and Father would sometimes respond with minor changes – like getting rid of some animals – but the improvements did not last. In December 2014, there were still five people and four to five pets in the home. Further, the home was without electricity for about a week in late summer of 2014.

[9] With respect to income, around February 2014, Father began a part-time, minimum-wage job that increased in hours over the course of the CHINS proceeding. He, however, refused recommendations to apply for food stamps and Medicaid. Further, a large amount of his paycheck was deducted for back child support. With the assistance of DCS, by mid-2014, Mother began receiving social

security disability benefits in the amount of $733 per month.[3] She also receives $20 in food stamps per month. Mother, Father, and Mindy share living expenses.

[10] On September 9, 2014, Child's permanency plan was changed from reunification to adoption. In its order, the trial court expressly found that despite Parents' participation in services, they had failed to demonstrate the ability to apply the information being provided by the service providers in order to provide a stable, appropriate home for Child. The court further found that due to the slow and limited progress of Mother and Father, achieving permanency for Child through a change in the plan was in Child's best interests. Thereafter, on September 19, 2014, DCS filed its petition to terminate the parental rights of Mother and Father as to Child.

[11] Supervised visits continued for several months but were suspended by the trial court in March 2015 upon the recommendation of Child's therapist. Visitation was stopped due, in part, to inappropriate interactions by Parents and the trauma visits caused for Child.

[12] Mother was unsuccessfully discharged from home-based therapy in December 2014, when her therapist determined Mother had met her maximum therapeutic benefit in their work together and made no significant progress. While Mother was able to verbalize needed changes, she failed to put those changes into action. This was consistent with the results of the psychological exam conducted in December

___

[3] Mindy is the payee of Mother's disability check.

2013. Dr. Jeff Vanderwater-Piercy explained that Mother exhibited a pattern of lack of initiative in addressing matters that warranted her attention and a pattern of consistent reliance on others. Dr. Vanderwater-Piercy noted "an enduring pattern of putting her own needs before those of [her] children". *Transcript* at 133. He indicated that Mother's repeated involvement with DCS, each time raising the same parenting concerns, suggests a lack of attachment with her children.

[13] Father's community-based therapist, Jessica Ramey, released him from therapy in September 2014. At that time, progress had stagnated and Ramey believed Father had reached maximum therapeutic benefit with her. Ramey indicated that Father had made some tangible progress in communication, housing, and employment. However, he had made little to no progress in his relationships, setting healthy boundaries, and anger management. Ramey also noted the recurrent concerns regarding the condition of the home – additional people, pets, smells, and utilities. With regard to the people and pets, Ramey was worried about possible eviction and the use of Parents' limited resources by these extra inhabitants. She also noted Father's concern that at least one of the people in the home was a drug user. Ramey believed Father's major barriers to reunification were his difficulty managing his mental health, continued instability in relationships, difficulty applying skills learned in therapy and case management, and lack of insight regarding child development. She opined that Father needed a long-term mental-health program that works with the seriously mentally ill on a consistent basis.

[14] The termination hearing was conducted on January 26, 2015, and May 13, 14, and 27, 2015. DCS witnesses testified consistent with the facts set out above.

Additionally, James Rowe, a life skills specialist and visitation supervisor in this case since July 2014, testified that Mother and Father have not been able to demonstrate consistent parenting or insight into Child's needs. Rowe indicated further that despite having increased income, "their living environment hasn't changed". *Id*. at 37. Deanna Graves, a visitation supervisor and Mother's home-based case manager until July 2014, noted concerns regarding housing and observed "it was hard for them to care for themselves let alone [Child]". *Id*. at 96. Although Graves's services ended in July 2014, she testified that she remained in touch with Mother and attended a supervised visit about a month before the termination hearing began. At that time, Graves observed additional people still living with Mother, Father, and Mindy.

[15] The family case manager (FCM) through February 2015 was Destiny Perry, who also served as the FCM in A.T.'s CHINS case. FCM Perry testified at the termination hearing that in addition to income concerns, housing stability remained an unresolved issue. She noted minor improvements regarding housing during the case, but no major improvements.[4] FCM Perry opined that Mother and Father were unable to provide permanency for Child because they lack stability for themselves and that adoption by the foster parents was in Child's best interests.

---

[4] FCM Perry explained the major barriers to reunification as follows:

> The major barriers is the, the conditions of the home. Um, the, the lack of resources and parents [sic] ability to understand when something is unsafe for their child[. For example,] there was a point in time when there was some guy who stayed the night at, at the house and [Father] didn't even know who the person was.

*Id*. at 206-07.

She testified that it would not be appropriate to give Mother and Father more time, as the case had been open since early 2013 and Child needs permanency. Further, FCM Perry indicated that she did not believe that there were additional services DCS could have offered Mother and Father that would have made a substantial difference in the outcome of this case.

[16] Child's therapist, Julie Bingham, indicated that Child has significant verbal delays, as well as emotional and developmental delays. Child attends a developmental preschool and participates in play therapy, trauma-focused therapy, and family therapy with her foster parents. Bingham testified that Child has displayed progress as a result of therapy and that "with the consistency she's getting nurturing, she's getting love, she's getting support, there is a consistent structure, um, which is all necessary for a child to have healthy development." *Id*. at 274-75. Bingham indicated that Child will need ongoing therapy and counseling for quite some time. If Child was returned to Mother and Father, Bingham expressed concerns regarding Child's wellbeing and safety.

[17] The guardian ad litem (GAL) testified that termination of parental rights and adoption by the foster parents were in Child's best interests. The GAL explained that Child has been with the foster parents since March 2013 and is bonded to them in a safe, stable home where her needs are being met. "She has consistent parenting there." *Id*. at 525.

[18] In Addition, the GAL noted her concerns regarding the cleanliness and safety of Parents' home. In particular, she described a supervised visit in November 2014:

[T]here were a number of pets …. [T]here were a number of people sleeping on the floor in the living room and the safety concerns I had related to that was that … I think I was there for a little bit over an hour and none of the adults that were sleeping on the pallets on the floor…woke up during the time that I was there. So, it's…kind of peculiar circumstances but one of the, what appeared to be a female…it was almost as if she had fallen asleep with a cigarette in her hand and I think her goal, maybe, was to have the cigarette over a[n] ashtray that was on the floor but there was probably, maybe this much ash kind of still on the cigarette that had it been burning and had it fallen, it would have fallen on the carpet.

*Id*. at 518-19. Additionally, the GAL noted the smell of animals and unwashed bodies.

[19] The GAL testified that she had visited Parents' home on May 6, 2015. Only Father was present, and he gave the GAL the impression that Mother "had taken up with someone else" and had not been home in a week. *Id*. at 521. Father indicated that there was a scheduled DCS visit and that he had unsuccessfully tried to reach Mother to help clean the apartment. As a result, he and Mindy cleaned for the scheduled visit. The GAL observed two cats and one dog on this visit. She returned for an unannounced visit on May 11, 2015, but there was no answer.

[20] The new FCM, James Wilbur, who took over in February 2015 for FCM Perry, testified briefly. He acknowledged that during a visit on May 6 or 7, 2015, the home was clean and appropriate. He noted, however, that Mother and Father had substantial advance notice of his visit and that it was apparent the home had been recently cleaned. Further, there was no bed in the home for Child.

[21] On July 15, 2015, the trial court issued its order terminating Mother's and Father's parental rights to Child. Based on its extensive findings, the trial court concluded:

> 8. There is a reasonable probability that the conditions that resulted in [Child's] removal and continued placement outside the home will not be remedied by her parents given the amount and length of services which have resulted in little progress as to insight and adequate and safe parenting skills.
>
> 9. Mental retardation, standing alone, is not a proper ground for terminating parental rights. *Egly v. Blackford County DPW*, 592 N.E.2d 1232 (Ind. 1992). Where parents are incapable of or unwilling to fulfill their legal obligations in caring for their children, then mental illness may be considered. *In re Wardship of B.C.*, 441 N.E.2d 208 (Ind. 1982).
>
> 10. Continuation of the parent-child relationship poses a threat to [Child's] well-being due to the lack of skills and insight to parent and provide a safe and stable environment and meet [Child's] basic and special needs. Continuation of the parent-child relationship would also thwart the goal of [Child] attaining a permanent home after being in foster care for over two years.
>
> * * *
>
> 12. Termination of the parent-child relationship in [sic] in [Child's] best interests to allow her to be adopted into a safe and stable home where she will continue to progress and have her needs met.

13. The permanency plan of adoption for [Child] is a
    satisfactory plan.

*Appellant's Appendix* at 20.  Accordingly, the trial court granted DCS's petition
to terminate Mother's and Father's parental rights with respect to Child.
Mother and Father now appeal.

## Discussion & Decision

[22] When reviewing the termination of parental rights, we will not reweigh the
evidence or judge the credibility of the witnesses.  *In re D.D.,* 804 N.E.2d 258, 265
(Ind. Ct. App. 2004), *trans. denied.*  Instead, we consider only the evidence and
reasonable inferences most favorable to the judgment.  *Id.*  In deference to the trial
court's unique position to assess the evidence, we will set aside its
judgment terminating a parent-child relationship only if it is clearly erroneous.  *In
re L.S.,* 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied.*  Thus, if the
evidence and inferences support the decision, we must affirm.  *Id.*

[23] The trial court entered findings in its order terminating parental rights.  When the
court enters specific findings of fact and conclusions thereon, we apply a two-tiered
standard of review.  *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143,
147 (Ind. 2005).  First, we determine whether the evidence supports the findings,
and second we determine whether the findings support the judgment.  *Id.*
"Findings are clearly erroneous only when the record contains no facts to support
them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind.

1996). A judgment is clearly erroneous only if the findings do not support the court's conclusions or the conclusions do not support the judgment thereon. *Id.*

[24] We recognize that the traditional right of parents to "establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.,* 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied.* Although parental rights are of constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.,* 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). In addition, a court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In re K.S.,* 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). The purpose of terminating parental rights is not to punish the parents, but to protect their children. *Id*.

[25] Before an involuntary termination of parental rights may occur in Indiana, DCS is required to allege and prove by clear and convincing evidence, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services[.]

Ind. Code § 31-35-2-4(b)(2)(B). DCS must also prove by clear and convincing evidence that termination is in the best interests of the child and there is a satisfactory plan for the child's care and treatment. I.C. § 31-35-2-4(b)(2)(C), (D).

[26] On appeal, both Mother and Father argue that the evidence was insufficient to support the involuntary termination of their parental rights. Father challenges a number of the trial court's specific findings and its conclusions as to I.C. § 31-35-2-4(b)(2)(B)(i) and (ii), (C), and (D). In sum, Father's argument is based on his slanted view of the evidence, which includes claims that the condition of the home had been remedied long before the termination of parental rights, "any lack of success was caused by DCS's failure to offer those services in a manner recommended for persons with cognitive challenges", and FCM Perry neglected the case. *Father's Brief* at 21. Father claims that he and Mother should be allowed additional time to complete services suited to their cognitive challenges. Mother's appellate argument, in a more succinct manner, track's Father's general arguments regarding I.C. § 31-35-2-4(b)(2)(B)(i) and (ii).

**Alleged Defective Findings**

[27] Father challenges a number of the trial court's findings of fact as defective. We will address each in turn.

[28] First, Father notes that finding number 3 indicates that Child was removed from the home on March 17, 2012, when she was actually removed on March 17, 2013. This was obviously a scrivener's error – much like Father's reference to the

incorrect year on page eight of his brief[5] – but we are at a loss as to how this mistake in any way affects the trial court's decision.

[29] Father next challenges finding number 17, which provides: "Ms. Graves could not recommend [Child] being placed back in the home as a result of the home not being suitable and parents not having an income adequate to care for [Child]." *Appellant's Appendix* at 17. Father acknowledges that this statement is supported by the evidence but claims it is "incorrect to the extent that it does not indicate Graves' failure to recommend placement back in the home was based on circumstances existing prior to July 2014." *Father's Brief* at 26. Father's argument is without merit. Moreover, we observe that finding number 16 expressly indicates that Graves provided home-based services from March 2013 to July 2014.

[30] Father lumps his challenge to findings number 28 and 29 together. These findings provide:

> 28. Therapy goals for [Father] involved bettering his parenting skills, managing his anger, and working on healthy relationships.
>
> 29. [Father] had difficulty in learning and retaining information in a parenting curriculum. He felt he knew how to parent and did not understand the bearing parenting had on the ChINS case.

---

[5] Dr. Vanderwater-Piercy's evaluation of Mother was done in 2013, not 2014.

*Appellant's Appendix* at 17. These findings are not clearly erroneous. The record clearly supports finding number 29. Further, we agree with DCS that Father's argument with respect to finding number 28 puts form over substance.

[31] Next, Father asserts that finding number 31 is partially inaccurate. The finding indicated: "Therapy ended in September of 2014 with little improvement in learning healthy relationships. [Father] still had anger issues. The therapist believed [Father] had reached the maximum therapeutic benefit that could be provided." *Id.* The therapist testified that she felt Father had reached maximum therapeutic benefit *with her* and recommended that he enter a long-term mental health program for the seriously mentally ill (a program he could not afford due to his lack of insurance). While the trial court's finding might be slightly ambiguous by not adding "with her" at the end of its finding, we cannot say that it is clearly erroneous.

[32] Finding number 33 indicated, among other things, that Father has been diagnosed as having mild retardation. Father claims that the record does not reveal such a diagnosis – only that he has cognitive limitations. While this distinction does not appear material for our purposes, there is evidence in the record that Father reported having been diagnosed with mental retardation. Accordingly, the finding is not clearly erroneous.

[33] Similarly, Father disputes finding number 37, which indicates that "parents' cognitive delays impede their ability to appropriately and safely parent a child." *Id.* at 18. Father asserts there was no evidence he had been diagnosed with any

"cognitive delay" or that he and Mother could not parent Child due to cognitive limitations. Father does not address the difference between "cognitive delay" and "cognitive limitation" or how this alleged distinction is relevant. Moreover, there is ample evidence in the record to support a finding that Parents' cognitive difficulties negatively impacted their ability to parent.

[34] Finding number 43 provides that Parents have resided in four different places during the CHINS case and, at times, have struggled to maintain utility services. Father acknowledges that they resided in four different residences. He argues, however, that the finding is incorrect to the extent it suggests unstable housing. In this regard, he notes that he and Mother have lived in their current residence for nearly two years and "mostly" have had no utility outages. *Father's Brief* at 29. This does not constitute an argument that the finding is clearly erroneous,[6] and we reject the veiled attempt to have us reweigh the evidence.

[35] Finally, Father argues that findings number 44 and 47 exaggerate and misstate the conditions of the home. These findings provide:

> 44. The respondent parents have a pattern of allowing people to rotate in and out of the apartment, sleeping on pallets. Drug use has taken place in the home. The home has also been inhabited on and off by several animals. The result is

---

[6] We remind Father that findings are "clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen*, 671 N.E.2d at 102. The trial court's finding is amply supported by the record.

an atmosphere of overwhelming cigarette smoke and the
smell of animals and body odor.

47. The parents have not established that they are able to
maintain an appropriate home after an historical inability
to provide a safe, clean and uninhabited environment.

*Appellant's Appendix* at 18. Except for one minor point, these findings are supported
by evidence in the record either directly or by inference. Again, we reject Father's
attempt to have us reweigh the evidence. The sole defect is contained in finding
number 44 with respect to drug use in the home. The only evidence regarding drug
use was Father's concern, expressed to his therapist, that an individual staying in
the home was using drugs outside the home.

**Challenged Conclusions**

[36] Both Mother and Father challenge the court's conclusions with respect to I.C. § 31-
35-2-4(b)(2)(B). In this regard, we observe that DCS was required to establish only
one of the three requirements of subsection (b)(2)(B) by clear and convincing
evidence. *See In re L.V.N.*, 799 N.E.2d 63, 69 (Ind. Ct. App. 2003). The trial court
found that DCS presented sufficient evidence to satisfy two of those requirements,
namely, that there is a reasonable probability the conditions resulting in Child's
removal or continued placement outside Parents' care will not be remedied and
that the continuation of the parent-child relationship poses a threat to Child's well-
being. *See* I.C. § 31-35-2-4(b)(2)(B)(i), (ii). We focus our inquiry on the former
requirement—that is, whether there was sufficient evidence to establish a

reasonable probability that the conditions resulting in Child's removal or continued placement outside Mother and Father's care will not be remedied.

[37] In making such a determination, the trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. The court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the child. *Id.* Further, the court may consider the parent's history of neglect and response to services offered through DCS. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003).

[38] The trial court's conclusion in this regard was expressly based on the length of time in which Parents had been provided services and their resulting lack of significant progress with respect to safe parenting skills and insight into Child's needs. The court observed that although they have maintained minimal income and housing, Mother and Father have not been able to demonstrate the skills or insight to safely and appropriately parent Child. The court also noted that Parents have never reached the point where it was recommended that parenting time could be unsupervised. The trial court's findings support this conclusion.

[39] The result in this case is particularly tragic because Mother and Father clearly love and are bonded with Child. Moreover, they made some strides – as recognized by the trial court – and cooperated to a large degree with service providers. Despite substantial provision of services over a lengthy period of time, however, they were

unfortunately unable to attain the skills or insight they needed to safely parent Child. *See Egly v. Blackford Cnty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1234 (Ind. 1992) (where parents are incapable of fulfilling their legal obligations in caring for their child, mental illness may be considered).

[40] Child was removed from the home in March 2013 due to general neglect and the condition of the home. By September 2013, the record indicates that Parents moved into a more suitable home and remained there throughout the rest of the case. While their address remained stable thereafter, the record establishes that the conditions inside their apartment did not. Even as late as November/December 2014, after termination proceedings had been initiated and twenty months after Child's removal, service providers observed excessive numbers of pets and people still living in the apartment. The GAL testified of concerns regarding the cleanliness and safety of Parents' home. She noted that during a supervised visit in November 2014, people were asleep on pallets in the living room throughout the entire visit. The apartment smelled of animals and unwashed bodies. Further, one of the sleeping individuals appeared to have fallen asleep with a burning cigarette in her hand. This is clearly not a safe and stable living environment for Child.

[41] The only time during this case that a service provider found the home to be clean and appropriate was more than two years after Child's removal and in the eleventh hour of the termination proceedings. Notably, Parents had significant advance notice, resulting in the home being cleaned just before the visit. This brief compliance says little against the backdrop of months and years of Parents living in

direct contravention of the recommendations of service providers.[7] *See K.T.K. v. Ind. Dep't of Child Services*, 989 N.E.2d 1225, 1234 (Ind. 2013) (trial court acted within its discretion when it disregarded efforts made only shortly before termination and weighed more heavily mother's history of conduct prior to those efforts). As found by the trial court, Parents have not been able to *maintain* an appropriate home after a historical inability to provide a safe, clean, and uninhabited environment.

[42] Mother and Father both criticize the services provided by DCS. For example, Father acknowledges that he received services for more than a year without achieving the level of insight and parenting skills desired by DCS. He asserts, however, that DCS administered services defectively because "[n]one of the people who provided significant services to Father had the education or training necessary to deal with individuals, like Father and Mother, with cognitive disabilities." *Father's Brief* at 34. Mother, similarly, insinuates that DCS failed to even attempt to help her.

[43] These arguments were asserted by Mother and Father throughout the lengthy termination hearing. The evidence, however, establishes that Parents were

---

[7] Parents' extensive DCS involvement with other children also lends support to the fact that their pattern of conduct is unlikely to be remedied. Further, we find unpersuasive Father's assertion that the fact A.T.'s CHINS case closed at the end of 2014 is evidence that the conditions in Parents' home had been remedied. A.T. was removed due to the conditions in *her father's home* and was returned to *his home* when the conditions were remedied. The record indicates that A.T.'s father has custody of her and that when Mother visits A.T., she generally does so at A.T.'s father's home.

provided numerous services[8] over a substantial amount of time – even after the termination proceedings commenced. An argument that there were more or better services available is not a proper method of attacking a termination order as contrary to law. *See In re H.L.*, 915 N.E.2d 145, 148 n.3 (Ind. Ct. App. 2009). *See also In re E.E.*, 736 N.E.2d 791, 796 (Ind. Ct. App. 2000) ("the provision of family services is not a requisite element of our parental rights termination statute, and thus, even a complete failure to provide services would not serve to negate a necessary element of the termination statute and require reversal").

[44] The trial court's conclusion that there is a reasonable probability the conditions resulting in Child's removal and continued placement outside Parents' home will not be remedied is supported by its findings of fact and not clearly erroneous. Accordingly, we need not reach the issue of whether continuation of the parent-child relationship poses a threat to Child's well-being.

[45] Father also challenges the trial court's conclusion that termination is in Child's best interests.[9] In determining the best interests of a child, a trial court is required to look beyond the factors identified by DCS and to consider the totality of the evidence. *In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009). In doing so, the

---

[8] Parents received individual therapy, couple's counseling, home-based case management, supervised visitation, individualized parent education through various service providers, employment and housing services, and psychological evaluations. Father also received medication management services, but he did not take his medication as prescribed.

[9] Father asserts in his reply brief that DCS indicated he did not challenge the trial court's conclusions regarding Child's best interests or whether a satisfactory plan existed. On the contrary, DCS's appellate argument makes clear its claim that Mother – not Father – effectively conceded the correctness of these conclusions by not arguing them in her brief.

court must subordinate the interests of the parents to those of the child, and need not wait until the child is irreversibly harmed before terminating the parent-child relationship. *Id.* "Permanency is a central consideration in determining the best interests of a child." *In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009).

[46] In this regard, Father notes that Child is bonded to Mother and Father, as well as her half-sister, A.T. He argues that although Child has progressed during her two years with her foster family, "it is unclear whether [Child] would have made the same progress if she had been in Mother and Father's home during that period." *Father's Brief* at 43-44. Further, he notes that Child still has behavioral problems and is, therefore, not really thriving in her foster home.

[47] These arguments are requests to reweigh the evidence, which we cannot do. The trial court found that termination would clear the path for Child to be adopted into "a family with which she is thriving and where she will be safe and nurtured and where all her needs will continue to be met." *Appellant's Appendix* at 19. The evidence supports this finding, as both FCM Perry and the GAL discussed the need for permanency and testified that termination was in Child's best interests. The court's finding, in turn, supports its conclusion that termination is in Child's best interests. *See In re J.S.*, 906 N.E.2d at 236 ("the recommendations of the case manager and court-appointed advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests").

[48] Finally, Father challenges the trial court's conclusion that the permanency plan of adoption by the foster family is a satisfactory plan for the care and treatment of Child. His argument is a reiteration of those above. He does not dispute that the plan for Child's care and treatment is adoption by the foster family or that the foster parents are willing to adopt.

[49] In order for the trial court to terminate the parent-child relationship, the court must find that there is a satisfactory plan for the care and treatment of the child. *In re S.L.H.S.*, 885 N.E.2d 603, 618 (Ind. Ct. App. 2008). The plan need not be detailed, so long as it offers a general sense of the direction in which the child will be going after termination. *Id.* "A DCS plan is satisfactory if the plan is to attempt to find suitable parents to adopt the children." *In re A.S.*, 17 N.E.3d 994, 1007 (Ind. Ct. App. 2014), *trans. denied*.

[50] Here, the foster parents desire to adopt Child, who has been in their care since March 2013. DCS's plan for the care and treatment of Child following termination is adoption by the foster parents. The trial court's conclusion that DCS has a suitable plan for Child's future care is not clearly erroneous.

[51] Judgment affirmed.

[52] Robb, J., and Barnes, J., concur.